## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **TONITA PHIPPS,** *as Administrator of the* ***Estate of Louis Christopher Latham***, | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | |
| **KAREN WILLIAMS,** | ) | |
| **JOHN Q. HAMM,** | ) | **Case No.:** |
| **GREG LOVELACE,** | ) | |
| **WENDY WILLIAMS,** | ) | |
| **CYNTHIA STEWART RILEY,** | ) | **JURY TRIAL DEMANDED** |
| **VENTRESS ASSISTANT WARDENS** | ) | |
| **DOE 1 AND 2,** | ) | |
| **and** | ) | |
| **ELIZABETH LASETER,** | ) | |
| *in their individual capacities*, | ) ) | |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiff Tonita Phipps, as Administrator of the Estate of Louis Christopher Latham, brings this action against Defendants Karen Williams, John Q. Hamm, Greg Lovelace, Wendy Williams, Cynthia Stewart Riley, Ventress Assistant Wardens Doe 1 and 2, and Elizabeth Laseter under 42 U.S.C. § 1983 for violations of the Constitution of the United States of America and Alabama State law. All defendants are sued in their individual capacities. Plaintiff alleges as follows:

### INTRODUCTION

Louis Christopher Latham ("Christopher") entered the Alabama Department of Corrections in 2006, when he was only twenty-three years old. He served eighteen straight years of a twenty-one-year sentence for robbery—his first felony conviction. He was scheduled to be

released in January 2026. Instead, in October 2023, Christopher was brutally beaten to death by at least two other inmates and died of blunt force trauma to the head.

Christopher was murdered while incarcerated within a prison system that has, for years, subjected those in its custody to an unconstitutionally substantial risk of serious harm from inmate-on-inmate violence. His death was the foreseeable and preventable result of this risk: he died because of the deliberate indifference of the correctional officers and supervisors at Ventress, as well as the deliberate indifference of high- and low-ranking ADOC officials. All these individuals subjectively knew of the unconstitutional risk of harm (both general and specific) that Christopher faced; had the duty and authority to change the unconstitutional conditions; and yet failed to act reasonably to prevent Christopher's death.

## JURISDICTION AND VENUE

1.      This action is brought under 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights under the Eighth Amendment to the United States Constitution.

2.      This Court has subject matter jurisdiction over Plaintiff's constitutional claims under 28 U.S.C. §§ 1331 and 1343(a).

3.      This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367(a).

4.      Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## PARTIES

### *Plaintiff*

5.      Plaintiff Tonita Phipps is the administrator of the estate of Louis Christopher Latham. Louis Christopher Latham ("Christopher") died on October 10, 2023, from blunt force trauma to the head after being severely beaten by at least two inmates. At the time of Christopher's

death, he was incarcerated at Ventress Correctional Facility ("Ventress") in Barbour County, Alabama, and under the care and supervision of the Defendants.

### *The Defendant Administrative Supervisors*

6.     Defendant John Q. Hamm is the Commissioner of the Alabama Department of Corrections ("ADOC" or "Department"), the state agency that administers the prison system in Alabama, and he held that position at all times relevant to this Complaint. As Commissioner, Defendant Hamm is the highest-ranking official in the ADOC, and he is responsible for the direction, supervision, and control of the ADOC and its employees. Defendant Hamm personally supervises the activities of the ADOC, and he is responsible for ensuring that ADOC employees are properly trained to perform their assigned duties and properly carry out their assigned duties. He is responsible for setting departmental policies and customs at the ADOC and its facilities; overseeing institutional policies and customs at ADOC facilities; supervising and approving the adoption of changes in departmental and institutional policies and customs; and planning, directing, controlling, and otherwise managing all ADOC facilities to ensure the safety and security of all prisoners. As Commissioner, Defendant Hamm is a final policymaker for the Department and has a duty to exercise ordinary and reasonable care for the protection of all people in the custody of the ADOC. He is sued in his individual capacity.

7.     Defendant Greg Lovelace is the Chief Deputy Commissioner of Corrections of the ADOC, and he held that position at all times relevant to this Complaint. As Chief Deputy Commissioner, Defendant Lovelace is responsible for the management and oversight of all operations and administrative divisions of the ADOC and its facilities. Defendant Lovelace personally supervises the activities of the ADOC, and he is responsible for implementing the rules, regulations, procedures, and standards governing the administration of the prison system in Alabama, and for ensuring the effective and safe daily operations of all prison facilities. As Chief

Deputy Commissioner, Defendant Lovelace is a final policymaker for the Department and has a duty to exercise ordinary and reasonable care for the protection of all people in the custody of the ADOC. He is sued in his individual capacity.

8.      Defendant Wendy Williams[1] was the Deputy Commissioner for Men's Services at the ADOC until in or about September 2024, and she held that position at all times relevant to this Complaint. As Deputy Commissioner, she was responsible for ensuring the effective and safe daily operations of all the men's prison facilities, including Ventress. Defendant W. Williams reported directly to Defendants Hamm and Lovelace, and she was the point person on the Department's administrative team regarding institutional security issues, including inmate-on-inmate violence and assaults. She had the duty and authority to suggest or require modifications to institutional policies and practices and to implement or supervise such changes as necessary. As Deputy Commissioner, Defendant W. Williams oversaw all aspects of institutional security at the facilities under her supervision by, among other things: reviewing facility policies and practices related to inmate classification, housing, and transfer; reviewing facility incident reports and investigations related to inmate violence and assaults and contraband confiscations; reviewing use-of-force reports and investigations; reviewing facility staffing plans; and reviewing personnel training records and practices. As Deputy Commissioner, Defendant W. Williams was a final policymaker for the Department and had a duty to exercise ordinary and reasonable care for the protection of all people in the custody of the ADOC. She is sued in her individual capacity.

9.      Defendant Cynthia Stewart Riley is a Regional Director at the ADOC. At all times relevant to this Complaint, Defendant Riley was the Regional Director for the Southern Region of

---

[1] Because there are two defendants with the last name "Williams," this Complaint will refer to Defendant Wendy Williams as "Defendant W. Williams" and Defendant Karen Williams as "Defendant K. Williams."

the ADOC, which includes Ventress, and she reported directly to Defendant W. Williams. As Regional Director, Defendant Riley is responsible for planning, monitoring, and reviewing the day-to-day operations of the correctional institutions in her assigned area, including Ventress. Her duties include supervising wardens; serving as a liaison between facilities and ADOC executive leadership; ensuring safe conditions at the facilities within her region; and leading the external security audit team. Defendant Riley maintains frequent contact with the wardens of all facilities within her region, including the wardens at Ventress. She also receives daily or near-daily reports from the facilities within her region; is notified of all urgent and emergent incidents, including homicides, fights with a weapon, fights causing serious injuries, sexual assaults, overdoses, and contraband confiscations; and receives and reviews staffing reports, audit reports, and suggested corrective action reports. As Regional Director, Defendant Riley is a final policymaker for the Department and has a duty to exercise ordinary and reasonable care for the protection of all people in the custody of the ADOC. She is sued in her individual capacity.

10.    Collectively, Defendants Hamm, Lovelace, W. Williams, and Riley are referred to as the "Defendant Administrative Supervisors."

### *The Defendant Facility Supervisors*

11.    Defendant Karen Williams is Warden III at Ventress, and, upon information and belief, she held that position at all times relevant to this Complaint. As Warden III, Defendant K. Williams is the head warden of Ventress, and she reports directly to Defendant Riley. Defendant K. Williams is responsible for all the day-to-day operations of Ventress; the safety and security of all prisoners there; and the supervision, discipline, and training of all Ventress employees. She was responsible for ensuring adequate supervision and monitoring of prisoners; adequate classification of prisoners; appropriate housing assignments for prisoners; adequate correctional staffing levels; appropriate discipline and deterrence of prisoner and staff misconduct; adequate implementation

of internal security audits; and proper installation, repair, maintenance, and monitoring of locks, cameras, and other devices necessary for the safety and security of inmates and staff at Ventress. She is responsible for creating, reviewing, revising, and approving all the standard operating procedures ("SOPs") at Ventress; reviewing and approving all proposed staffing plans; and managing, monitoring, and supervising the operations and personnel at Ventress to ensure that all critical posts are filled and all essential functions are completed. Defendant K. Williams reviews and approves incident reports, shift officer reports, and use-of-force reports; and she remains aware of trends at Ventress related to inmate population, staffing levels, assault frequency and severity, and the prevalence of weapons, drugs, electronics, and other contraband. As Warden III, Defendant K. Williams is a final policymaker for Ventress and has a duty to exercise ordinary and reasonable care for the protection of all people incarcerated there. She is sued in her individual capacity.

12.     Defendants Ventress Assistant Wardens Doe 1 and 2 were assistant wardens at Ventress at all times relevant to this Complaint. As assistant wardens, Defendants Ventress Assistant Wardens Doe 1 and 2 were responsible for the day-to-day operations of Ventress; the safety and security of all prisoners there; and the supervision, discipline, and training of all subordinate employees. At all times relevant to this Complaint, Defendants Ventress Assistant Wardens Doe 1 and 2 reported directly to Defendant K. Williams. Defendants Ventress Assistant Wardens Doe 1 and 2 were responsible for ensuring adequate supervision and monitoring of prisoners; adequate classification of prisoners; appropriate housing assignments for prisoners; adequate correctional staffing levels; appropriate discipline and deterrence of prisoner and staff misconduct; and adequate implementation of internal security measures. They supervised and oversaw institutional activities at Ventress; managed captains, lieutenants, and other subordinate correctional staff; conducted institutional inspections; and assisted in ensuring the safety and security of inmates and staff at Ventress. As assistant wardens, they reviewed and approved

incident reports, shift officer reports, and use-of-force reports; and remained aware of trends at Ventress related to inmate population, staffing levels, assault frequency and severity, and the prevalence of weapons, drugs, electronics, and other contraband. Defendants Ventress Assistant Wardens Doe 1 and 2 were final policymakers for Ventress and had a duty to exercise ordinary and reasonable care for the protection of all people incarcerated there. They are both sued in their individual capacities.

13.     Collectively, Defendants K. Williams and Ventress Assistant Wardens Doe 1 and 2 are referred to as the "Defendant Facility Supervisors."

### *Defendant Laseter*

14.     Defendant Elizabeth Laseter the correctional captain responsible for security at Ventress at all times relevant to this Complaint and, upon information and belief, she held that position until in or around November 2024. As Security Captain, Defendant Laseter was responsible for supervising all lieutenants, sergeants, correctional officers, and other correctional security staff at Ventress. Defendant Laseter oversaw institutional operations at Ventress by, among other things: ensuring that prisoners were given safe and appropriate housing assignments; reviewing subordinates' shift logs, duty post logs, and other mandated paperwork to ensure that facility operations are being conducted and logged as required; reporting incidents of inmate-on-inmate violence, threats, or extortion to Ventress's wardens and/or the ADOC's Law Enforcement Services Division ("LESD") when appropriate; and ensuring that subordinates are supervising inmates, conducting contraband searches, responding to incidents, and conducting security checks as required. As Security Captain, Defendant Laseter was a final policymaker for Ventress and had a duty to exercise ordinary and reasonable care for the protection of all people incarcerated there. She is sued in her individual capacity.

## FACTUAL ALLEGATIONS

15.     In August 2023, Christopher was incarcerated at Staton Correctional Facility in Elmore, Alabama.

16.     On or about the evening of August 18, 2023, Christopher was brutally beaten in the head with a weight by other inmates.

17.     Christopher's beating was so severe that, less than one day later, both of his eyes were swollen shut and the left side of his face had swelled to approximately twice its normal size.



**Pictures of Christopher approximately one day after his August 18, 2023 beating at Staton**

18.     Initially, the ADOC responded to Christopher's beating by briefly examining him in the prison's infirmary and sending him directly back to general population. Despite the obviously severe injury to Christopher's face and head from the beating—and the resulting serious risk of a concussion, skull fracture, brain bleed, or other potentially life-threatening neurological injury—the ADOC's medical staff did not conduct or order any diagnostic medical tests to determine the extent or severity of Christopher's injuries. The ADOC's medical staff did not even hold him in the infirmary for a period of observation.

19.     Additionally, upon information and belief, ADOC correctional staff did not investigate Christopher's assault or punish his assailants; did not contact the ADOC's LESD to

request further investigation into Christopher's assault; and did not offer Christopher a safe, alternative housing assignment.

20.    Christopher's beating, including the shocking pictures of his injuries, became public within days. Advocates and concerned citizens inundated Staton and the ADOC's Central Office with calls and emails asking about Christopher's status and demanding that he receive medical treatment. At least one statewide news website published an article about Christopher's beating and the ADOC's inadequate response.[2]

21.    Because of the public pressure, the ADOC eventually sent Christopher to a local hospital, where he reportedly received diagnostic scans of his head. He was returned to Staton soon after.

22.    Christopher's August 2023 beating at Staton was not the first time he had been assaulted by other prisoners. Christopher, like many inmates in Alabama's prisons for men, had spent years enduring abuse, intimidation, and extortion at the hands of other inmates. He had frequently reported the threats, assaults, and extortion to correctional staff at multiple facilities over the course of his incarceration, telling them that he feared for his life and physical safety. He made these reports throughout his entire period of incarceration, including in the years immediately preceding his death.

23.    Upon information and belief, many of the reports Christopher made—or parts of those reports—were documented in his inmate file and were thus easily accessible to all ADOC personnel at every facility. Nevertheless, Christopher's requests for help and protection were

---

[2] Patrick Darrington, *Multiple incidents of violence reported in ADOC facilities over weekend*, Alabama Political Reporter (Aug. 22, 2023), *available at* https://www.alreporter.com/2023/08/22/multiple-incidents-of-violence-reported-in-adoc-facilities-over-weekend/.

repeatedly ignored, and he was routinely assigned to dorms known by ADOC correctional staff to be especially dangerous. Correctional staff also rejected Christopher's periodic requests to be assigned to the Restrictive Housing Unit ("RHU")—the ADOC's term for segregation cells, also referred to as "lockup"—where people at risk of assault often seek to be placed for "safekeeping." Instead, ADOC correctional officers repeatedly disregarded the risk to Christopher's safety, leaving him to fend for himself and often resulting in him being assaulted—just as he had warned the officers about.

24.    Sometime in the month or so after his August 2023 beating at Staton, Christopher was transferred to Ventress.

25.    When Christopher arrived at Ventress, the circumstances he had faced time and again during his incarceration in the ADOC repeated themselves: correctional officers disregarded the obvious risk he faced of being assaulted by other inmates.

26.    The danger to Christopher when he arrived at Ventress in the fall of 2023 was especially obvious because it was widely known that Christopher had recently been seriously assaulted. Staton is in the same county as Ventress, and the facilities are less than ninety minutes apart. The amount of publicity given to Christopher's assault at Staton meant that all correctional staff at Ventress, including the Defendant Facility Supervisors and Defendant Laseter were almost certainly aware of that assault and the circumstances surrounding it.

27.    Further, the kind and amount of citizen outreach that occurred immediately after Christopher's assault at Staton—numerous phone calls and emails directly to Staton and the ADOC's Central Office, as well as social-media posts and news media contacts—nearly always attracted the attention of ADOC officials, including high-level officials, meaning that the

Defendant Administrative Supervisors also likely knew of Christopher's assault at Staton and the circumstances surrounding it.

28.     Despite the obvious danger Christopher faced at Ventress of being assaulted by other inmates, he was nevertheless assigned to a dorm that correctional officers knew was dangerous and knew would be particularly dangerous to Christopher.

29.     Defendant K. Williams told a member of Christopher's family that Christopher was placed in a population dorm instead of a restrictive housing cell because there were no restrictive housing cells available.

30.     On or about October 4, 2023, soon after he arrived at Ventress, Christopher suffered the predictable result of the Defendants' actions: he was beaten to death by inmates Carlos Williams, AIS #238705, and Marcus Walker, AIS #199535.

31.     Upon information and belief, Williams and Walker assaulted Christopher because of a $10 drug debt.

32.     Upon information and belief, Williams and Walker each had a reputation for violence and were known to have assaulted other inmates in the past. Both men are still incarcerated. Williams is serving a life sentence for robbery out of Jefferson County, and Walker is serving a forty-year sentence for murder out of Lee County. Both men are currently classified as "close" custody, which is the ADOC's most restrictive custody level, and is usually reserved for inmates with frequent or repeated violent behavior. The ADOC's January 2018 Male Classification Manual stated that "[a]ssaultive behavior resulting in the death of a victim will required at least thirty (30) months in Close custody."

33.     Although Christopher was reportedly life-flighted out of Ventress to a local hospital the same day of his assault, his family was not notified of his injuries or hospitalization for several days.

34.     By the time Christopher's family was told of his condition, he was brain dead.

35.     Christopher died on October 10, 2023, from blunt force trauma to the head.

### The Widespread History of Unconstitutional Conditions Within the ADOC

36.     Conditions inside Alabama's prisons have historically been among the worst in the nation. Alabama's prisons are overcrowded, understaffed, and saturated with drugs. Inmate-on-inmate violence is common. It is the norm—not the exception—for prisoners to have weapons. These conditions have existed across the ADOC for years, and Defendants have known about them and failed to take reasonable action to correct them.

37.     In October 2016, the U.S. Department of Justice ("DOJ") opened a statewide investigation into the conditions of Alabama's prisons for men. The investigation focused on whether prisoners are adequately protected from physical harm and sexual abuse by other prisoners; whether prisoners are adequately protected from excessive force and sexual abuse by correctional officers; and whether the prisons provide safe, sanitary, and secure living conditions.[3]

38.     In April 2019, the DOJ published the first of two reports of its investigation.[4] The April 2019 Report concluded that reasonable cause existed to believe that "Alabama routinely

---

[3] Press Release, U.S. Dep't of Justice, *Justice Department Announces Statewide Investigation into Conditions in Alabama's Prisons for Men* (Oct. 6, 2016), *available at* https://www.justice.gov/usao-mdal/pr/justice-department-announces-statewide-investigation-conditions-alabama-s-prisons-men.

[4] Press Release, U.S. Dep't of Justice, *Justice Department Alleges Conditions in Alabama Men's Prisons Violate the Constitution* (April 3, 2019), *available at* https://www.justice.gov/opa/pr/justice-department-alleges-conditions-alabama-mens-prisons-violate-constitution; Letter from the U.S. Dep't of Justice, Notice Regarding Investigation of

violates the constitutional rights of prisoners housed in [its] prisons by failing to protect them from prisoner-on-prisoner violence and prisoner-on-prisoner sexual abuse, and by failing to provide safe conditions," and that these violations "are exacerbated by serious deficiencies in staffing and supervision and overcrowding."[5]

39.    The DOJ's investigation "revealed that an excessive amount of violence, sexual abuse, and prisoner deaths occur within Alabama's prisons on a regular basis."[6]

40.    At the time of the DOJ's investigation, Alabama's prisons for men had the highest homicide rate in the country.[7] The ADOC reported nine homicides across its male facilities in 2017, translating to a homicide rate that year of fifty-six per 100,000 prisoners—approximately eight times the 2014 national average homicide rate of seven per 100,000 prisoners.

41.    That homicide rate has since gone up. In 2022, the ADOC reported seventeen homicides within its men's prisons, which had an average population of approximately 16,000.

---

Alabama's State Prisons for Men (April 2, 2019), *available at* https://www.justice.gov/opa/press-release/file/1150276/download ("April 2019 Report").

The DOJ published a second report in July 2020, in which it "concluded that there is reasonable cause to believe that [Alabama's male] prisoners are subjected to excessive force at the hands of prison staff." Press Release, U.S. Dep't of Justice, *Justice Department Alleges Excessive Force in Alabama's Prisons for Men Violates the Constitution* (July 23, 2020), *available at* https://www.justice.gov/archives/opa/pr/justice-department-alleges-excessive-force-alabama-s-prisons-men-violates-constitution.

[5] *Id.*

[6] *Id.* at 2.

[7] The ADOC's 2017 homicide rate was the highest in the country, even though it was underreporting the number of homicides in its prisons for men. Examining the ADOC's reported deaths between January 2015 and June 2018), the DOJ "definitively identified three" three homicides that the ADOC had publicly reported as "natural" deaths—despite each autopsy classifying the death as a homicide. April 2019 Report at 11. Based on "[t]hese unreported homicides," the DOJ found "reasonable cause to believe that ADOC's homicide rate is higher than what ADOC has publicly reported." *Id.*

That corresponds to a homicide rate of 105 per 100,000 prisoners, nearly nine times the 2019 national average homicide rate of twelve per 100,000 prisoners.

42.    The next year, in 2023, the ADOC reported fourteen homicides within its men's prisons (which still incarcerated approximately 16,000 people), translating to a homicide rate of eighty-seven per 100,000 prisoners—more than seven times the 2019 national average homicide rate.

43.    Three of the homicides reported in 2023 occurred at Ventress, where Christopher was incarcerated. Based on Ventress's average population that year of 1,230 prisoners, its 2023 homicide was an unconscionable 243 killings per 100,000 prisoners—twenty times the national average and nearly three times the ADOC's already staggeringly high overall homicide rate.[8]

44.    The overall death rate (not just death by homicide) in Alabama's male prisons is also well above the national average. The national average mortality rate for state prisoners in 2019 was 330 per 100,000. In 2022, the ADOC reported that 260 people died within its men's prisons, translating to a mortality rate in those prisons of 1,610 per 100,000—nearly five times the 2019's national average. That mortality rate rose in 2023. The ADOC reported that 318 people died in its men's prisons in 2023, giving it a mortality rate of 1,987 per 100,000 prisoners—more than six times the 2019 national average.

45.    Ventress, where Christopher was murdered, was even more deadly than the ADOC's male prisons as a whole.

---

[8] Homicides are also significantly more likely to occur in Alabama's prisons for men than anywhere in the free world. The 2021 global homicide rate was approximately six per 100,000 people. The 2021 murder rate in Honduras, one of the highest in the world, was approximately thirty-eight per 100,000 people. In other words, if Alabama's male prisons were a nation, its 2023 murder rate would have been the highest in the world, by far.

46.     In 2022, Ventress incarcerated an average of 1,255 people. Of those 1,255 people, the ADOC reported that twenty-three of them died. That means that *one of every fifty-three people* incarcerated at Ventress died in 2022. Ventress's corresponding mortality rate—1,877 deaths per 100,000 prisoners—was more than five times the 2019 national average.

47.     2023 was even more deadly for the men incarcerated at Ventress. That year, Ventress incarcerated, on average, 1,230 people. Twenty-five of those people died—or *one person of every fifty*. Ventress's mortality rate that year (2,032 per 100,000 prisoners) was six times the 2019 national average.

48.     The death and homicide statistics above rely on quarterly data the ADOC is legally required to publicly report.[9] However, for decades, the ADOC has underreported, misreported, and falsified information about the deaths of the people it imprisons.

49.     In its 2017 investigation, the DOJ discovered that, in a period covering less than four years (January 2015 through June 2018), the ADOC had publicly misreported three deaths as occurring from "natural causes," even though each of the associated autopsy reports had unequivocally identified "homicide" as the cause of death.[10] "These unreported homicides" led the DOJ to conclude that "reasonable cause to believe that ADOC's homicide rate is higher than what ADOC has publicly reported."[11]

---

[9] *See* Ala. Code § 14-1-24 (requiring that the ADOC provide to the legislature quarterly reports containing statistical data on a variety of subjects).

[10] April 2019 Report at 11. One autopsy report "detail[ed] multiple stab wounds to the prisoner's head, abdomen, back, and arm," one of which "extended through the [prisoner's] scalp," hit his skull, and caused a "depressed skull fracture 1/4 inch in diameter." *Id.* (internal quotations omitted). Another autopsy report "noted injuries to the [prisoner's] scalp, a skull fracture, . . . bleeding on the surface of the brain," and reported that the prison had "sustained a fractured rib, which caused bleeding into the right chest cavity." *Id.* The ADOC had reported that each of these prisoners died from "natural causes." *Id.*

[11] *Id.*

50. The DOJ's investigation also revealed that, during that same four-year period, the ADOC had not reported "at least 30 deaths" of people in its custody.[12] Moreover, at least some of those deaths had been homicides.[13]

51. The DOJ's conclusions are bolstered by investigations conducted by journalists and nonprofit organizations, as well as innumerable anecdotal accounts from prisoners' family members and loved ones. One nonprofit organization's investigation into deaths within ADOC custody concluded that "ADOC's reporting is rife with errors, contradictions, and a lack of transparency." Among other inconsistencies, the investigation "found instances where ADOC reported death locations that did not match the reported facility where the deceased person was last incarcerated."

52. In other words, even though the numbers of overall deaths and homicides that the ADOC publicly reports are staggeringly high, even those shocking numbers are almost certainly an undercount.

53. Strong evidence indicates that the ADOC also dramatically underreports the number of non-deadly assaults that occur within Alabama's prisons for men. In its 2017 investigation, the DOJ concluded that reasonable cause existed "to believe that ADOC does not record all violent incidents in incident reports."[14] It reached this conclusion based on a number of factors. For one thing, "high-level" ADOC management admitted to the DOJ that ADOC personnel did not document all violent incidents in incident reports. Additionally, through in-person and

---

[12] *Id.* at 15.

[13] *Id.* Included in these entirely unreported deaths were the following. In February 2017, a prisoner at Staton died after suffering "numerous stab wounds to the [his] back and chest." *Id.* In May 2017, a prisoner at Bullock died "after being stabbed multiple times by multiple fellow prisoners." *Id.*

[14] April 2019 Report at 23.

telephone interviews with prisoners, as well as telephone interviews with prisoners' family members, the DOJ received hundreds of reports of violent incidents—reports that contained "specific details about contemporaneous events"—for which no ADOC incident report existed.[15] The DOJ also found that although "[t]he number of prisoners [they] interviewed who had either been stabbed or had stabbed another prisoner was overwhelming," "many of the[] stabbings go unreported to security staff."[16]

54.    Nevertheless, while the ADOC's public reports account for only a fraction of the assaults that actually occur in its prisons for men, even those reports show that the people incarcerated within its prisons for men live in a horrifically violent environment where they are constantly subjected to unpredictable, dangerous, and life-threatening circumstances.

55.    In 2022, the ADOC reported that 1,491 assaults occurred within its thirteen male prisons during that year—or more than 113 assaults per prison per year. Those numbers rose the next year: the ADOC reported 1,841 assaults across its men's prisons in 2023—about 141 assaults per prison per year.[17]

56.    Of the assaults the ADOC reported in 2022, 152 of them occurred at Ventress, which had an average population that year of 1,225 people. That means that, according to the ADOC's reports, about one of every eight prisoners at Ventress was assaulted in 2022.

57.    Assaults at Ventress were even more common the next year. The ADOC reported 275 assaults at Ventress in 2023, which had an average population that year of 1,230 people. Thus,

---

[15] *Id.*

[16] *Id.* at 26.

[17] The average population of Alabama's male prisons was approximately the same in 2022 and 2023.

according to the ADOC's reported numbers, nearly one in every four prisoners at Ventress was assaulted in 2023.

58.     Amplifying the dangers prisoners face solely from the *frequency* of assaults within the facilities, Alabama's prisons for men are also overrun with weapons.

59.     In 2019, the DOJ reported that the "ADOC does not effectively control the introduction, manufacture, and use of weapons" within its male facilities, as is made especially clear from "the level of violence and stabbings indicated in ADOC's own incident reports."[18] Moreover, the DOJ's investigation revealed that both the prevalence of weapons within the facilities and the typicality of prisoners' possession and use of those weapons was common knowledge among prison officials of all levels: captains, lieutenants, shift commanders, and correctional officers all acknowledged the ubiquity of weapons in the prisons.

60.     Weapons remain commonplace inside the ADOC. In 2022, the ADOC reported confiscating from its prisons for men a total of 3,310 weapons, including ten firearms. Those prisons incarcerated about 16,000 prisoners on average that year, meaning that the ADOC confiscated one weapon for approximately every 4.8 prisoners that year.

61.     The ADOC confiscated even more weapons the next year. In 2023, it reported confiscating 5,461 weapons from its male facilities, including seven firearms. The prisoner population was similar that year, meaning that the ADOC reporting confiscating one weapon for every three prisoners in 2023.

62.     Ventress was particularly rife with weapons. In 2022, Ventress held only about seven percent (1,225) of the approximately 16,000 people imprisoned in Alabama's male facilities. Nevertheless, the ADOC reported confiscating 623 weapons (including one firearm) at Ventress

---

[18] April 2019 Report at 25, 26.

that year—or nearly 19% of all the weapons confiscated from Alabama's prisons for men. Those numbers equate to a 2022 weapon-confiscation rate at Ventress of one weapon for about every two prisoners.

63.    The next year, 2023, the ADOC reported confiscating fewer weapons from Ventress—447 total. Ventress's average population that year was 1,230, which means that the ADOC confiscated one weapon for every 2.75 prisoners at Ventress in 2023.

64.    Exacerbating the violent and dangerous circumstances described above, Alabama's prisons for men are extraordinarily overcrowded, and have been so for years.

65.    Overcrowding makes prisons even more dangerous for many reasons. Alabama, like many states, responded to prison overcrowding by converting common areas into "open dormitories"—large rooms filled with bunk beds packed closely together. These makeshift living arrangements amplify inmate-supervision problems because officers cannot see across the dormitory to monitor all the prisoners. Overcrowding also increases competition for the use of all resources—showers, toilets, phones, recreational equipment, and space. These characteristics make it more likely that conflicts will arise among prisoners and less likely that officers will be able to effectively interrupt or stop those conflicts.

66.    At the time of the DOJ's investigation, Alabama's prisons for men operated at 165% of their intended capacity, incarcerating 6,445 more people than they were designed to house.

67.    At all times relevant to this Complaint, the overcrowding in the ADOC's male facilities had not declined.

68.    In 2022, Alabama incarcerated an average of 16,178 individuals within its male facilities. These facilities were designed to imprison 9,585 people—or nearly 6,600 people fewer

than the ADOC packed into them. Thus, in 2022, Alabama's prisons for men held 168% of the people they were designed to incarcerate.

69.    The numbers in 2023 were similar. The ADOC reported an average population of 16,053 people in its prisons for men—6,468 people more than the facilities were designed to house. In 2023, therefore, Alabama's prisons for men incarcerated 167% of the people the facilities were designed to house.

70.    At all times relevant to this Complaint, Ventress was consistently more overcrowded than the ADOC's male facilities as a whole, regularly incarcerating nearly twice the number of people it was designed to house.

71.    Ventress is designed to imprison 650 people. In 2022, its average population was 1,225 people—or 575 more prisoners than it was designed for. Thus, in 2022, Ventress housed a population at 188% beyond its designed capacity.

72.    Ventress was similarly bursting in 2023. That year, an average of 1,230 people were incarcerated at Ventress—580 more people than it was designed to house, meaning that Ventress operated in 2023 at 189% of its intended capacity.

73.    Not only are Alabama's prisons historically overcrowded, they are also woefully understaffed.

74.    Alabama's correctional-staffing deficiencies have been the subject of numerous lawsuits, legislative hearings, and news reports. The ADOC has been under court order for years to increase its staffing levels. Nevertheless, those staffing levels remain abysmal.

75.    In February 2018, acknowledging that the ADOC's "lack of correctional staff leaves many ADOC facilities incredibly dangerous and out of control and causes prisoners and

correctional officers alike to be justifiably afraid for their safety," a federal court ordered the ADOC to improve the correctional staffing levels inside its male prisons.[19]

76.     In the same month as the court's order, the ADOC had described its correctional-officer shortages as "critical." At that time, its male facilities were operating, on average, with only 42.5% of the correctional officers they needed: altogether, the facilities required 3,361 full-time officers to operate safely, but the ADOC only employed 1,431 full-time officers.

77.     Nearly seven years later, the correctional-staffing levels within the ADOC's prisons for men have improved by less than one percent. For the quarter ending in March 2025, the most recent quarter for which the ADOC's correctional-staffing levels are public, the ADOC reported that its male prisons were operating with 46.06% of their necessary correctional officers: 3,357.33 full-time officers were required, but only 1,546.5 were employed.

78.     At all times relevant to this Complaint, the correctional-staffing levels were even worse. The following charts show the correctional-staffing levels in 2022 and 2023 across all of the ADOC's facilities for men:

| 2022 – All ADOC Male Facilities | | | | |
|---|---|---|---|---|
| | Jan.–Mar. 2022 | Apr.–June 2022 | July–Sept. 2022 | Oct.–Dec. 2022 |
| # of required full-time officers | 3626 | 3626 | 3626 | 3626 |
| # of employed full-time officers | 1411 | 1331 | 1267.5 | 1211.5 |
| % staffed | 38.91% | 36.71% | 34.96% | 33.41% |

---

[19] *Braggs v. Dunn*, No. 2:14cv601-MHT, 2018 U.S. Dist. LEXIS 26338, at *14 (M.D. Ala. Feb. 20, 2018) (internal quotation marks omitted).

| 2023 – All ADOC Male Facilities | | | | |
|---|---|---|---|---|
| | Jan.–Mar. 2023 | Apr.–June 2023 | July–Sept. 2023 | Oct.–Dec. 2023 |
| # of required full-time officers | 3626 | 3466.07 | 3466.07 | 3466.07 |
| # of employed full-time officers | 1147.5 | 1184.5 | 1267 | 1314 |
| % staffed | 31.65% | 34.17% | 36.55% | 37.91% |

79.    As these charts illustrate, in 2022 and 2023, and at all times relevant to this Complaint, the ADOC's prisons for men as a whole always operated with less than forty percent of the correctional officers required to safely operate the prisons.

80.    Ventress's correctional-staffing levels were particularly abysmal. The following charts show the correctional-staffing levels in 2022 and 2023 specific to Ventress:

| 2022 – Ventress Only | | | | |
|---|---|---|---|---|
| | Jan.–Mar. 2022 | Apr.–June 2022 | July–Sept. 2022 | Oct.–Dec. 2022 |
| # of required full-time officers | 253 | 253 | 253 | 253 |
| # of employed full-time officers | 84 | 79 | 76 | 71 |
| % staffed | 33.20% | 31.23% | 30.04% | 28.06% |

| 2023 – Ventress Only | | | | |
|---|---|---|---|---|
| | Jan.–Mar. 2023 | Apr.–June 2023 | July–Sept. 2023 | Oct.–Dec. 2023 |
| # of required full-time officers | 253 | 247.56 | 247.56 | 247.56 |
| # of employed full-time officers | 62.5 | 66 | 64 | 63 |
| % staffed | 24.70% | 26.66% | 25.85% | 25.45% |

81.     As these charts show, when Christopher arrived at Ventress in the fall of 2023, correctional-staffing levels there had fallen nearly every month since January 2022. And by the last quarter of 2023, when Christopher was murdered, Ventress employed just over one-quarter—25.45%—of the correctional officers it needed to operate safely.

82.     It is well known that correctional "understaffing equates to inadequate supervision that results in a substantial risk of serious harm" to incarcerated individuals.[20]

83.     The extreme understaffing that exists in Alabama's prisons for men means that prisoners are "unsupervised and largely left to their own devises."[21] Dorms of several hundred inmates are regularly supervised by only one officer—or by no officer at all. Most dorms remain locked, leaving hundreds of prisoners confined in an overcrowded space with no supervision and no reliable way to access help in the case of an emergency. Prisoners injured in fights, who were sexually assaulted, or who overdosed on drugs often wait hours before they can leave the dorms to get help. Seriously injured prisoners have died while locked in dorms and unable to access medical attention.

---

[20] April 2019 Report at 9 (collecting cases).

[21] April 2019 Report at 47.

84.     In sum, and as detailed above, Alabama's prisons for men are "an environment rife with violence, extortion, drugs, and weapons."[22]

### *Defendants Knew of the Unconstitutional Conditions at Ventress*

85.     By virtue of their positions in the ADOC, all Defendants knew about the unconstitutional conditions at Ventress, including the overcrowding and understaffing, the widespread violence, the ubiquity of weapons and drugs, and the resulting risk of harm to Ventress's inmates.

86.     It is part of the Defendant Administrative Supervisors' jobs to be aware of trends in the ADOC population, including correctional staffing and inmate population rates, mortality rates, assault rates, and contraband confiscation rates, as is being aware of those trends at each specific ADOC facility, including Ventress. It is part of the Defendant Facility Supervisors' jobs and Defendant Laseter's job to be aware of those same trends specific to Ventress and to review reports of specific deaths, assaults, and contraband confiscations at Ventress. And because her daily duties included supervising inmates and correctional officers and overseeing searches for contraband, Defendant Laseter aware firsthand of the overcrowding and understaffing, the high rates of deaths and assaults, and the prevalence of drugs and weapons at Ventress.

87.     Furthermore, at the time of Christopher's death, it was common knowledge among staff and supervisors at Ventress and within the ADOC, including all Defendants, that the combination of understaffing and overcrowding significantly increased violence within prisons and the risk of harm to inmates.

88.     The dangerous conditions at Ventress have been so prevalent for such a long time that the substantial risk to inmates in Ventress is obvious simply from being inside the prison,

---

[22] *Id.* at 5.

which is a part of each of the Defendants' jobs.

89.     Furthermore, all Defendants knew of the danger specific to Christopher because all Defendants subjectively knew of his assault at Staton in August 2023.

***Defendants Failed to Respond Reasonably to the Unconstitutional Conditions at Ventress***

90.     By virtue of their positions in the ADOC, all Defendants had the authority and ability to minimize the unconstitutional risk of harm to inmates at Ventress. Nevertheless, all Defendants failed to respond reasonably to that risk.

91.     The Defendant Administrative Supervisors and the Defendant Facility Supervisors were all in positions to create and enforce policies and procedures at Ventress that would have minimized the violence and presence of weapons and drugs within Ventress. These defendants nevertheless failed to implement and/or enforce such policies and procedures.

92.     The Defendant Administrative Supervisors and the Defendant Facility Supervisors were all in positions to create and enforce policies and procedures at Ventress that would have improved the staff culture in ways that would have both (a) decreased the understaffing at Ventress by making Ventress a more attractive place to work, making it easier to hire correctional staff and (b) increased the supervision of inmates by Ventress existing correctional staff. These defendants nevertheless failed to implement and/or enforce such policies and procedures.

93.     The Defendant Administrative Supervisors and the Defendant Facility Supervisors were all in positions to create and enforce policies and procedures at Ventress that would have decreased the dangerous effects of overcrowding at Ventress. These defendants nevertheless failed to implement and/or enforce such policies and procedures.

94.     All Defendants were in positions to train and/or discipline Ventress personnel in ways that would have both (a) increased correctional officers' supervision of inmates and (b) decreased the number of weapons and the amount of drugs present within Ventress. Defendants

nevertheless failed to adequately train and/or discipline Ventress personnel.

95.     Each of Defendants' failures described above, as well as other failures by Defendants that are yet unknown, caused Christopher's death on October 10, 2023.

**CAUSES OF ACTION**

<u>**COUNT I**</u>
**Violation of the Eighth Amendment – All Defendants**
*Failure to Protect from a Known, Substantial Risk of Serious Harm*

96.     Plaintiff incorporates by reference paragraphs 1 through 95 of this Complaint.

97.     Defendants were each responsible for ensuring the safety of all prisoners at Ventress, including Christopher.

98.     The conditions at Ventress, including the pervasive and normalized culture of violence, chronic understaffing, corruption, lack of inmate supervision, and ready access to weapons and contraband, posed a substantial risk of serious harm from inmate-on-inmate violence to all inmates at Ventress, including Christopher.

99.     These conditions and the resulting risk of serious harm have been well-documented and widely known for years, including in the years before the events that form the basis of this Complaint. The risk of harm is also readily apparent to any individual inside Ventress.

100.     Defendants each subjectively knew of the risk of harm specifically to Christopher because Defendants each subjectively knew of the circumstances surrounding Christopher's assault at Staton in 2023.

101.     Defendants each know and have known about this substantial risk of serious harm to every inmate at Ventress, including Christopher.

102.     Defendants, by virtue of their position, each had the ability and authority to address the conditions that led to the substantial risk of serious harm.

103.    Nevertheless, Defendants each failed to take reasonable action to address these conditions. For example, the Defendant Administrative Supervisors and the Defendant Facility Supervisors failed to enact, enforce, and/or follow reasonable policies and procedures designed to provide adequate security and supervision at Ventress; failed to discipline and/or train correctional staff when correctional staff failed to provide adequate security and supervision at Ventress; failed to address known security deficiencies, such as lack of intercoms, operative security cameras, and mirrors; and exacerbated the risk and condoned the conduct and conditions creating this substantial risk of serious harm at Ventress.

104.    The misconduct described in this count was objectively unreasonable and was undertaken willfully, intentionally, maliciously, and/or with deliberate indifference to the substantial risk of serious harm to Christopher, in violation of his constitutional rights.

105.    The misconduct described in this count directly and proximately caused Christopher's death on October 10, 2023, which resulted from being brutally beaten by other inmates.

## COUNT II
### Violation of the Eighth Amendment – All Defendants
#### *Supervisory Liability: Failure to Protect from a Known, Substantial Risk of Serious Harm*

106.    Plaintiff incorporates by reference paragraphs 1 through 95 of this Complaint.

107.    Through the actions described above, correctional staff at Ventress violated Christopher's Eighth Amendment rights.

108.    By virtue of their supervisory positions, each Defendant was responsible for training, disciplining, and/or supervising Ventress's correctional staff to ensure that they took reasonable steps to protect inmates at Ventress, including Christopher.

109.    As described above, despite knowing of the need to adequately train, discipline,

27

and/or supervise Ventress's correctional staff to ensure that they took reasonable steps to protect inmates at Ventress, including Christopher, Defendants failed to do so.

110.    Defendants' failure to train, discipline, and/or supervise Ventress's correctional staff resulted in those individuals failing to reasonable steps to protect Christopher, despite knowing that he faced a substantial risk of serious harm.

111.    The misconduct described in this Count was objectively unreasonable and was undertaken willfully, intentionally, maliciously, and/or with deliberate indifference to the substantial risk of serious harm to Christopher, in violation of his constitutional rights.

112.    The misconduct described in this count directly and proximately caused Christopher's death on October 10, 2023, which resulted from being brutally beaten by other inmates.

### COUNT III
### State Law Wrongful Death – All Defendants

113.    Plaintiffs incorporates by reference paragraphs 1 through 95 of this Complaint.

114.    Plaintiff, as Administrator of the Estate of Louis Christopher Latham, asserts this claim against Defendants under Alabama Code § 6-5-410, for Defendants' actions which cause Christopher's wrongful and unlawful death.

115.    Because of their professional roles, Defendants each owed a duty to exercise ordinary and reasonable care for the protection of all people in the custody of the ADOC, including Christopher.

116.    Among other things, Defendants each had a duty to safely house Christopher and protect him from violence by other inmates.

117.    Defendants each breached the standard of care they owed to Christopher by the actions described above.

118.    The risks and harms that Defendants caused are within the scope of protection afforded by the duties Defendants owed to Christopher.

119.    As a result of Defendants' acts and omissions, Christopher died on October 10, 2023, after being brutally beaten by other inmates.

**PRAYER FOR RELIEF**

Plaintiff respectfully requests that the Court enter judgment against all Defendants, jointly and severally, and also order as follows:

a.    Find in favor of Plaintiff on all Counts;

b.    Award compensatory damages to Plaintiff, and against all Defendants, in an amount to be determined at trial;

c.    Award punitive damages to Plaintiff, and against all Defendants, in an amount to be determined at trial;

d.    Award Plaintiff recovery of attorneys' fees and other costs; and

e.    Award any other relief the Court deems appropriate.


Respectfully submitted this 6th day of October 2025.

*/s/ Susanne Emily Cordner*
Susanne Emily Cordner
(ASB-4687-C61N)
Joseph Mitchell McGuire
(ASB-8317-S69M)
*McGuire & Associates, LLC*
31 Clayton Street
Montgomery, Alabama 36104
334-517-1000
scordner@mandabusinesslaw.com
jmcguire@mandabusinesslaw.com

*Attorneys for Plaintiff*